Good morning, Your Honors, and may it please the Court. My name is Courtney Lynn. I am counsel for the defendant and appellant, Collins Christensen. This is a single-count mail fraud prosecution resolved by a pre-indictment plea agreement. At sentencing, the district court varied upward from a guideline range of 33 to 41 months to sentence Mr. Christensen to 60 months, a sentence nearly twice the 33-month sentence the government had recommended. The district court, in justifying the upward variance, referred to victim statements of loss and harm, statements that the court and probation had previously determined were not subject to probing for veracity. Reliance on those untested victim statements made a difference. Some of them were materially contradicted by the court's factual findings and violated due process, as did the court's speculation about what would have happened at trial had any number of victims come forward to testify. Mr. Christensen remains in the custody of the Bureau of Prisons and is not scheduled to be released until April of 2016. The rule in this circuit is that a due process violation arises when a court relies on false or unreliable information, demonstrably so. This Court's decision last year in McGowan instructs that the concerns about reliability can arise when facts are used that have not passed through the traditional procedural mechanisms used to test the veracity of information. The victim impact statements appear to be the only way for testing the veracity of these statements would have been to go to trial, right? No, Your Honor. The court, if it elected to rely upon the victim impact statements, could have undertaken to have those statements submitted under penalty of perjury, could have provided Mr. Christensen with an opportunity to cross-examine those witnesses. Instead, probation and the court indicated that it did not view the victim statements as subject to speculation based on their truth. Well, just a minute now. The victim impact statements, maybe they weren't in, but they were referred to in the probation report, right? They were – some were included in the probation report, correct, Your Honor. But in responding to Mr. Christensen's informal objections, one of which challenged the victim statement as misleading, probation responded, it is not my place to rewrite the statement or speculate as to its veracity. Which one was misleading? Is that Jennifer? No, that would be Twyla Kaye. And what did Twyla Kaye say that was misleading? Twyla Kaye exaggerated the harm to her. I think she asserted that she had been promised returns of 100 to 200 percent, and she had an ill motive for making those assertions. She was involved in parallel civil litigation with Mr. Christensen in which she had threatened that if Mr. Christensen didn't resolve that litigation favorably, she would really lay it on in a follow-on letter to the Court. All right. Now, did you challenge the accuracy or reliability of those assertions at the sentencing? Judge Toshima, we did not. And we did not because up until the point at which the parties submitted the case for pronouncement of sentence, the Court had given no indication that it had deviated from probation's conclusion that they were not put before the Court for the truth of the matter. Probation said they are simply relayed to the Court. The Court at the first ---- All right. But in the course of sentencing, the judge made quite a few statements about victim impact, right? That's correct, Your Honor. That's a statement. He went through a whole list of victims now. That's correct. So maybe the inference is, you know, he wouldn't have gone through those unless he thought they were reliable and he was relying on them. But at some point after that, did you make any objections? Your Honor, we made two objections after the Court had pronounced the sentence, one of which went to this issue, which was the element of surprise that the Court  had not previously been briefed by the parties. The Court ---- there's no question that the Court adopted probation's rationale that victim statements are not subject to testing for veracity, because at the first sentencing hearing, the Court said that probation had responded appropriately    The Court said that probation had responded appropriately to Mr. Christensen's objections and overruled Mr. Christensen's informal objections. Now, so what's the remedy that you want here? Remand and reassignment to a district judge, a different district judge. Why would we reassign him? I think that the record reflects that the judge is too invested in the outcome of this case to put it out of mind in the ways of the evidence. What evidence do you have that he's too invested? In the first go-around, the judge, the day before the hearing, offered as a justification for an upward variance Mr. Christensen's personal use of funds. No party had raised that previously to that point. At sentencing in October that occurred a few weeks later, he offered a different rationale for that upward variance, again, a rationale that had not been offered by either party. But let's suppose the Court didn't think that assignment to another judge was appropriate. You still want to send back to the same judge? Yes, Your Honor. Okay. For sentencing in which you will request an opportunity to either have the victim statements put under oath and or an opportunity to cross-examine them. And an opportunity to resolve factual conflict. Okay. If we bring those witnesses before the Court, this is going to look a lot like a mini-trial on sentencing, isn't it? Not necessarily. I think the conflicts that exist are pretty crystallized. The most important conflict that exists is in Jennifer R.'s victim statement. Isn't there a danger? I mean, the district court told your client that he thought he probably saved your client some time or your client had saved himself some time by pleading. And that if he had paraded 20 to 30 witnesses on the stand during the course of this trial, that he might have gotten a whole lot more than 60 months. Now, isn't there a danger here that if you go back and start hearing the witnesses that the judge will think that maybe your client gets more than 60 months? I mean, you may want to be careful what you wish for. There's a risk of that, Your Honor. I would add that the statement that the district judge made, that 20 to 30 victims would have come forward to testify at trial, is itself suspect. We know from the plea agreement and that there were only 14 investors that the government had identified. Probation said there was at least 15, not all of whom were victims. So when the Court indicates 20 or 30 victims are going to come forward and testify, it's not clear what the factual basis for that is, especially when you take into account that two of those victims spoke on Mr. Christensen's behalf at the time of the sentencing. And I can sense that the Court is concerned about my argument for reassigning to a different district judge. I want to emphasize that this was the work of the judge. No party before the judge was advocating for this variance. The parties agreed to a low-end guideline sentence of 33 months. Probation had recommended a mid-level guideline sentence of 37 months. And the district judge constructed and reconstructed the rationale for getting there. That shows a degree of investment different in kind from what might occur at a sentencing where you remanded to the same judge. This is not a case where the judge has invested a substantial amount of time, either in a trial or lengthy pretrial proceedings, such that you would risk multiplication or duplication of effort. Your Honors, if I may, I'd like to reserve the balance of my time for rebuttal. Roberts. Roberts. Thank you, counsel. Good morning, Your Honor. Your Honors. May it please the Court, I am Camille Skipper, appearing for the United States. In this case, the district court did it right, and it did everything that it was required to do. It correctly found the guideline range to be 33 to 41 months. Before that, it had resolved the single objection that was before it that the defendant had raised at sentencing, which dealt with restitution. After considering that range, it determined that it wasn't adequate. It then gave a lengthy and detailed explanation for the 19-month upward variance. Here's my problem with his upward explanation for the upward variance. He, as I said earlier, went through a long narrative of the losses that the victim suffered. But for many of them, most of the losses weren't the result of criminal activity, just the result of a bad investment. And it looks like he's making an upward variance because these were bad investments, not because of any criminal activity that appears in the record. Doesn't it appear that way? Your Honor, I think there are two responses to that. And I would say that that's not quite correct in this case. First, this wasn't just the result of bad investments. The defendant was ‑‑ I didn't say just the result. Partly the result. I mean, that's what he took into account in his upward variance. Well, certainly there were losses that occurred because the district court assumed that this ‑‑ these investments began with legal intentions. The defendant didn't start off trying to bilk the victims. But over time, as some of these investments went bad, the defendant then began to lie to the investors, lull, and in essence gain additional funds with misrepresentations in order to try to keep this thing going. So it's not just that he took in $100,000, investments went bad, and now he's been charged with a crime. He was engaged in long‑term criminal activity in this case. And that's what the district court was talking about when it says that this went on for two or three years. The district court went way beyond that. I know what he talked about. I can give you the name. But, you know, one of the investors, well, you know, wasn't able to retire. But as far as the record shows, that investor lost from criminal activity only $4,000 or $5,000. And that's not going to, you know, prevent a retirement out of a $100,000 investment. I mean, sure, that investor lost money, but it was because it was a bad investment. It's not because the defendant diverted funds to his personal use. I mean, that's the kind of thing the district court took into consideration in the upward variance, isn't it? Well, that's one of the things that the district court took into consideration. And that's an error, isn't it? You shouldn't punish somebody for a noncriminal activity, should you? No, he shouldn't be punished for noncriminal activity. And that's what the district court did. I disagree. Well, you said that's what the district court took into account in the upward variance. It's one of ‑‑ You agreed with me on that. One of the things that the district court took into account is ‑‑ Right. And he shouldn't have taken that into account at all. Well, he shouldn't have taken it into account if what we're referring to is legal activity that the defendant was engaged in that somehow resulted in loss to the victims. Right. However, what the court was looking at in this case was the defendant's illegal activity that resulted in losses. There's nothing in the record that shows that these losses resulted from illegal activity. The record doesn't support that. But the district court looked at and what he referred to, and here I'm specifically referring to the parts of the record, pages 13 through 17 of the excerpt of the record where the district court is explaining the reasons for the upward variance, are that the defendant used ‑‑ he was consciously and deliberately bilking investors over a two‑to‑three‑year period. Bilking is not simply making bad investments and losses occurring. Bilking is when you're lying and making misrepresentations to the victims. He specifically referred to one egregious ‑‑ some egregious conduct on the defendant's part when victims went out to the property that was supposedly being developed with their funds and found that nothing was happening. They called the defendant about it, and the defendant began with lies, putting them off, and then ended up yelling at them and hanging up the phone. The district court looked at that specifically and found that to be particularly egregious conduct. When he talks about the egregious conduct at ER 16, he's talking about lying, covering up, using the funds for personal expenses, none of which were invested for the defendant to use for personal expenses, and then talking about cheating victims. But to the extent the record shows that he diverted investor funds for personal expenses or personal use, that's fine, you know, to base a sense on that. But the district court went beyond that. I mean, he just attributed the entire investment loss to the defendant's wrongdoing, and I don't think there's anything in the record to support that. In other words, you're not contending that an upward variance can be based on noncriminal activity, are you? No, Your Honor. Don't you think that's what the district court did? No, Your Honor. I believe that the district court based the variance on the fact that although the investment activities began with legal intentions, the defendant did not intend to defraud at the beginning of the scheme. However, over time, as he began to experience losses, he then began an illegal scheme in order to do with his – what he says his intention was to eventually be able to pay everyone back, but he was using illegal means to do it. He was lying to the investors. Well, look at this, for instance. This is one of the things the district court says, ER 55. Mr. Gillespie has been unable to retire. He's a retirement-age person, as planned. So he's had to continue to work. But the record shows that Mr. Gillespie lost $5,496 due to the diversion of funds to personal use. That's the total of it. Now, so the district court must be referring to something else when he says Mr. Gillespie was unable to retire, right? And he's blaming that on the defendant, which has to be because it's a bad investment. We know they lost all their money, but that's not criminal. That's just, you know, taking a bad risk. What do you make of that statement? Well, Your Honor, I think here that the assumption, as I understand it from the court, is that the $5,000 that you're referring to was lost simply by a bad investment, not by any illegal conduct by the defendant. No, no, no. $5,000 is what was diverted. And that's – And the rest of his loss is attributable to a bad investment, obviously. At least that's all the record shows. Well, and there I assume you're referring to the pre-sentence report and the record that the FBI created of losses. Well, I'm referring to everything that was before the court at sentencing. Yes. And it had those documents as well as the victim impact statements. Right. The – But a lot of the victim impact statements, that's what I'm getting at. You don't have to do, well, if I knew how bad this investment was going to be, I wouldn't have invested it. Well, that's not, you know, saying it was – the loss was due to criminal activity. There's lots of those kinds of victim impact statements in the record, right? Well, I think what the victims are saying is if I knew that the defendant wasn't telling me the truth about the activities that he was going to be engaged in, I wouldn't have invested. And when they say the truth, they're talking about, you know, wild speculation about how much money they can make. They're not talking about, you know, diverting funds. No, what they're talking about are the misrepresentations that the defendant made to them about what they could earn should they invest with him. Those were misrepresentations. And those misrepresentations induced the defendants to – or induced the victims to invest and to keep their money in as he lulled them with lies and pervenant misrepresentations. But just a minute. Just a minute. Isn't this indictment based upon misappropriation by the defendant? The misappropriation of funds, yes. That's the charge. Based upon misrepresentations to the investors on what the investment was, is it? Well, the misrepresentations – well, the indictment itself is not. Well, answer my question first. That's not what the indictment is based on, is it? No, it isn't. All right. So the crime he's charged with is misappropriation. Yes. And these investors aren't talking about misappropriation. Well, for purposes of 3553A, the Court was looking at the entire scheme and the course of conduct, the defendant's history, the defendant's conduct, the crime charged, as well as surrounding circumstances. He's also looking at the harm or the impact on the victims from the defendant's criminal activity. So under 3553A, the Court is looking at a broad range of activities. Well, I could go with you if the course explanations were more in line with your argument. But the course explanations are not in line with that argument. The course explanations just, you know, talk about the total loss to the victims without any findings that those losses were due to criminal activity. That's as far as the findings go. In other words, it just talks about total losses. Well, the loss amount, for the purposes of the guideline range, was something less than a million dollars, 900-and-something thousand dollars. Right. That's a lot of money, Your Honor. And that was certainly — and so it's not as if the district court looked at this case and said, oh, we have losses of $5,000 or $15,000 to these victims, and these claimed harms of loss of marriage, loss of home, other circumstances, therefore, I'm going to vary upward to 19 months. Surprise, surprise. He did say all those things, didn't he? Contributed to the defendant. Well, you know, this fellow's marriage fell apart because of what you did. Well, that is a statement that one of the victims, Jennifer R., makes in her victim impact statement. Right. And the district court takes that into account in the variance. Absolutely, Your Honor. But here's the crux of the matter. All of these victim impact statements were before the court and before the parties. The court looked at them and had no reason on the face of them to question whether they were reliable. The defendant gave him no reason to question whether they were reliable. I'm not talking about reliability. I'm talking about what the loss is attributable to. In other words, the victim didn't claim my entire loss was attributable to misappropriation by the defendant. They didn't say that. They just said I lost X dollars from a bad investment. Yes. And the court. And the court. And there's no evidence that that was due to criminal activity. And yet the court took that amount into consideration in the variance. But what the court also has before it is the calculation of the guideline range, which is a 900, over $900,000 loss. Also, it's that he shouldn't have taken those amounts into consideration because they're not the result of criminal activity. At least the record doesn't show that. The loss amount for purposes of guidelines was more than $900,000. The court certainly could have taken that amount into consideration. Now, the court didn't make specific findings with regard to the victim impact statements of how much loss it was going to take into account there. But that's a 3553A analysis, which didn't make findings. I'm talking about the variance. Right. And so when the variance is based as part of the 3553A analysis, not a part of the guideline analysis. So for guideline purposes, the court had a $900,000 loss. The part of the guideline, I'm saying that the court is taking losses due to non-criminal activity into account in the variance. And he shouldn't have done that because a defendant shouldn't be subject to a greater sentence because of non-criminal activity. You agreed with that. That's true. But I guess what I don't agree with, Your Honor, is that the $900,000 loss that the court was looking at in this case. He didn't tie it to the $900,000. He just talked about general losses. But $900,000. Total loss. Everything that was lost. But the $900,000 is what was before the court. If there is no loss. And the inference is the court went beyond the $900,000. Well, that's an inference that may be drawn, but I don't believe that's the inference that should be drawn in this case. If there is no loss above the nearly million dollars in this case that was before the court, that that, along with the other factors that the court was looking at, could justify a 19-month upward variance. That's the government's argument here. Not that the court needed to find a loss of $2 million in order to justify the 19-month upward variance. And the court did point to other things other than the loss and the impact on the victims. The court also mentioned the fact that the defendant had been, had a previous conviction which was not scored in this case, but for which, from which the defendant appeared not to have learned anything. The court, the court also looked at the ways in which the defendant gathered victims using affiliation and affinities and personal relationships. The court found that particularly egregious. He also found that the use of personal, the use of victim funds for personal expenses and the fact that he was consciously bilking the victims for a two- to three-year period. And one of the things that the court notes, because putting this in context, the defendant was asking for a probationary sentence. One of the things that the court notes is that the early plea in and of itself does not entitle the defendant to an even greater showing of leniency before the court. He'd already received a three-level reduction in his offense level under the guidelines for acceptance of responsibility. The court found that his early plea did not entitle him to anything more than that. And so that was a part of the analysis. You may want to wrap up. You're more than four and a half minutes over your time. Oh, my gosh. I apologize. I would just note that because the court did everything right here and made a clear record, this sentence should be affirmed. Okay. Mr. Lin. Judge Toshima expressed concern about loss having been attributed to Mr. Christensen. It wasn't fraud loss. It was investment loss. I think the best example of that was the Court's reference to the victim that concerned the district judge the most. And that was Jennifer R. The Court said, and I quote, So not only did she lose her entire life savings, which the Court had previously said was $330,000, but her 19-year marriage has ended as a result of the defendant's criminal behavior. In fact, in the pre-sentence report in the table at paragraph 25, the total amount invested that's reflected for Jennifer R. is 90,000. The total amount lost or occasioned as a result of the fraud was 23,017. The district judge in pronouncing sentence overstated her loss by more than $300,000 on the victim that he considered to be very important or most troubling to him. I think that's a pretty graphic example of demonstrable reliance on false or unreliable information. Thank you, Your Honors. Okay. Thank you. We thank both counsel for the argument. Christensen is under submission.
judges: Stafford, Tashima, Bybee